**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **PEGGY J. BARNUM,**<br><br>       **Plaintiff,**<br><br>   v.<br><br>**OHIO STATE UNIVERSITY MEDICAL CENTER,** *et al.*<br><br>       **Defendants.** | **Case No. 2:12-cv-930**<br><br>**Judge Peter C. Economus**<br><br>**MEMORANDUM OPINION AND ORDER** |

      Plaintiff Peggy J. Barnum brought this action against Defendants The Ohio State University Medical Center ("OSUMC"); E. Gordon Gee, in his official capacity as President of the Ohio State University ("OSU"); Steven G. Gabbe, in his official capacity as Chief Executive Officer of OSUMC; Ronald Harter, in his individual capacity and official capacity as Chair of the Anesthesia Department of OSUMC; Stephen Pariser, in his individual capacity and official capacity as Chair of the Peer Review Committee of the Ohio State University ("Peer Review Committee"); and John and Jane Does Number One through Ten ("John and Jane Does"), in their individual capacities and official capacities as members of the Peer Review Committee. Barnum alleges that Defendants retaliated against her for voicing concerns regarding OSUMC's privacy practices, discriminated against her based on disability or perceived disability, and denied her due process and equal protection by placing her on leave and by eventually reinstating her under less favorable conditions of employment. This matter is before the Court for consideration of OSUMC's motion to dismiss the second amended complaint. (Dkt. 15.) For the reasons set forth below, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

**I.     Allegations**

The Second Amended Complaint alleges the following.  OSUMC has employed Barnum as a Certified Registered Nurse Anesthetist since 2006, and from 2006 to September 2011, Barnum received excellent annual reviews.  (2d Am. Compl. ¶¶ 5–6[1].)

"On or about September 29, 2011, Ms. Barnum was talking with a co-worker about her ongoing divorce proceedings with her current husband who is an employee at OSU Managed Care," an entity related to OSUMC.  "During a lunch break, Ms. Barnum was describing and venting some of her frustrations with a co-worker and she pointed her fingers like a gun and pointed it at her head at the lunch table and said out of frustration 'It's going to be a cold day in hell before the divorce gets resolved.'"  (2d Am. Compl. ¶¶ 6–7.)

"On October 5, 2011, Dr. Harter, Chair of the [OSUMC] Anesthesia Department, called Barnum and recommended that she call Dr. Pariser, a psychiatrist at [OSUMC], because 'her co-workers were concerned' about Barnum."  "Barnum called Dr. Pariser and left a message stating that she was already seeing a counselor to help her through the frustration of the ongoing divorce and she did not feel any further action was warranted."  (2d Am. Compl. ¶¶ 8–9.)

On October 7, 2011, Drs. Harter and Pariser called Barnum on her cell phone and insisted she report to the OSUMC emergency department for a psychological evaluation.  Barnum informed them that she was in the middle of a shift at her second job at the Columbus Eye Center.  She also "voiced concern that her husband might see the treatment records or bills for service in his capacity as a psychiatric nurse case manager for OSU's managed care business and he might use this against her in their divorce proceedings."  She explained "that her comment to

---

[1] The Second Amended Complaint appears to contain misnumbered paragraphs, with the numbering starting over at one in the "Jurisdiction and Venue" section and then skipping two and three.  The paragraph numbers cited in this order begin in the "Factual Allegations" section of the Second Amended Complaint.

the coworker was done out of frustration with her marital situation and that she was not suicidal nor had ever had any thoughts of hurting herself." Nevertheless, Drs. Harter and Pariser instructed her to report to the emergency room within the hour. Barnum was about to go into a procedure administering anesthesia and could not follow their directive. However, because she felt her job was in jeopardy if she did not comply, she went to the OSUMC emergency department following her shift at Columbus Eye Center. (2d Am. Compl. ¶¶ 10–11.)

In the emergency department, Barnum explained to the treating physician, Dr. Nadorf, why she was there. Dr. Nadorf stepped away three times to speak with Drs. Harter, Pariser, and Brush, another psychiatrist. Ms. Barnum had not granted permission for Dr. Nadorf to speak with anyone about this matter. (2d Am. Compl. ¶ 12.)

"Dr. Nadorf, a young resident, had difficulty finding anything wrong with Barnum," and "kept telling her that 'They are pushing me hard for a diagnosis.'" Barnum was released with instructions to continue to see her Employee Assistance Program ("EAP") counselor regarding her divorce-related frustration. (2d Am. Compl. ¶¶ 13–14.)

On or about October 10, Barnum followed up with EAP counselor Diane Hawley. While Barnum had not given anyone permission to speak about her medical condition, Hawley stated that she had spoken with Dr. Pariser about Barnum's situation. Hawley required Barnum to sign a written authorization for Hawley to speak with Drs. Harter and Pariser on a going-forward basis. Hawley said, "you have to sign the release for Drs. Harter and Pariser to speak with me as a condition of returning to work." "Fearing for the loss of her job, . . . Barnum, against her will, signed the release with the false hope that it would help her return to work without any further interruptions." (2d Am. Compl. ¶ 14.)

Dr. Pariser required Barnum to attend another session with Hawley on October 17, 2011. "Hawley related to Barnum 'This is big. Really BIG. This is from the top. You are in big trouble.'" (2d Am. Compl. ¶¶ 15–16.)

At an unknown time, Barnum's credentials to practice at OSUMC "were placed in limbo," she was placed on an unspecified leave of absence, and she was marked as "ill" on the scheduling calendar. Upon information and belief, the Peer Review Committee caused Barnum to be placed on this unspecified leave of absence, following a hearing at which Barnum was not permitted to speak or to have an attorney represent her. Neither the Peer Review Committee nor OSUMC notified Barnum of the reason for suspending her credentials and placing her on unpaid leave. (2d Am. Compl. ¶ 18.)

In October through December of 2011, Barnum informally and unsuccessfully attempted to obtain reinstatement and return to work. (2d Am. Compl. ¶ 19.)

On November 16, 2011, at OSUMC's instruction, Barnum underwent a fitness for duty examination with Dr. Brian Masterson at her own expense. Dr. Masterson unsuccessfully tried to contact Dr. Harter for his input. On February 22, 2012, Dr. Masterson delivered his report to OSUMC, finding that Barnum was, and always had been, fit for duty. (2d Am. Compl. ¶¶ 20–23.)

"In March 2012, [OSUMC] requested that Barnum sign an open-ended medical release for all her records to be used for any purpose and valid for one year," alleging that OSUMC "needed the release to discuss the situation with Dr. Masterson." Barnum instead provided a "[HIPAA]-compliant release that reasonably limited [OSUMC]'s access to her medical records for the specific purposes of returning Barnum to work." She "permitted OSU to speak with Masterson or submit follow up written questions for his response," and requested that her

4

attorney be included in verbal communications between OSUMC and Dr. Masterson. (2d Am. Compl. ¶¶ 25–26.)

On April 18, 2012, Barnum filed a complaint with the U.S. Department of Health and Human Services (HHS) Office for Civil Rights (OCR) against OSUMC alleging a breach of Federal Standards for Privacy of Individually Identifiable Health Information. Barnum suspected that her husband, who worked in the managed care billing department and saw all mental health related activity, was accessing her medical information. "Barnum was also concerned about Drs. Harter and Pariser's unauthorized discussions with Barnum's counselors. Barnum believed that Dr. Pariser and her ex-husband, who knew each other from years of working in related departments, were coordinating their actions to harass Barnum and adversely impact her employment." (2d Am. Compl. ¶ 27.)

In June of 2012, OSUMC insisted that Drs. Harter and Pariser needed to talk "doctor to doctor" with Dr. Masterson, without attorneys on the phone, in order to expedite Barnum's return to work. Barnum signed another release permitting OSUMC to confer with Dr. Masterson. "[OSUMC] and Dr. Masterson spoke in July 2012, and by all accounts, Dr. Masterson's opinion that Barnum was fit for duty remained unchanged." (2d Am. Compl. ¶¶ 28–29.)

"[I]n July 2012, Barnum provided a second independent psychiatric examination and report from Dr. Joseph Spare, M.D., at her own expense, who also concluded that Barnum was fit for duty." Barnum also continued to work at the Columbus Eye Center. (2d Am. Compl. ¶ 30.)

"On or about November 9, 2012, OSU returned Barnum to work, but eliminated her sick days, altered her schedule, changed her work location, [and] altered her case assignments."

Barnum was historically scheduled at the same location each day, but is now required to check-in to determine the location of her shift every preceding evening. She was also requested to work "different days of the week that conflict with her second job." OSUMC "refuses to pay for Barnum's required education." Upon information and belief, Barnum is the only nurse subjected to this treatment. Additionally, her "re-credentialed period" was initially limited to three months, rather than the customary 2 years, but OSUMC recently extended the period to two years. (2d Am. Compl. ¶ 31.)

Based on the above allegations, the Second Amended Complaint contains the following counts: (Count 1) First Amendment retaliation under 42 U.S.C. § 1983; (Count 2) conspiracy to deprive Barnum of equal protection under 42 U.S.C. §§ 1983 and 1985; (Count 3) a claim against Defendants Harter and Pariser for neglect to prevent violations of equal protection under 42 U.S.C. § 1986; (Count 4) deprivation of liberty and property interests without due process of law under 42 U.S.C. § 1983; (Count 5) discrimination based solely on disability, perceived disability, and/or classification or misclassification as disabled, in violation of the Rehabilitation Act, 29 U.S.C. §§ 701 et seq., and specifically 29 U.S.C. § 794; and (Count 6) discrimination based on disability or perceived disability in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 1201 et seq., including 42 U.S.C. § 12132.

## II.     Standard of Review

OSUMC moves to dismiss this action under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which requires the dismissal of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter,

6

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Furthermore, "[a]lthough for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it] [is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*, 129 S. Ct. at 1949–50 (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

### III.    Analysis

#### Count 1.    First Amendment Retaliation

Barnum first asserts that Defendants retaliated against her for exercising her First Amendment rights. Specifically, she alleges:

> Defendants and their employees, all state actors acting under the color of law by virtue of how they invoked or applied the OSU policies, conspired and acted in concert to defame, stigmatize, and disadvantage Peggy J. Barnum in her employment relationship to punish and retaliate against her for alleging various privacy violations of federal law and regulations. Such conduct by Defendants constituted First Amendment retaliation and violated Peggy J. Barnum's rights under the First and Fourteenth Amendments to the U.S. Constitution, and gives rise to a claim for relief, including money damages against Defendants Harter, Pariser, and John and Jane Does No. 1-10 under 42 U.S.C. 1983.

(2d Am. Compl. ¶ 33.)

Because OSUMC is an instrumentality of the State of Ohio, it cannot be sued for monetary damages under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989); *Russell v. Univ. of Toledo,* 537 F.3d 596, 610 (6th Cir. 2008). Nor can the individual defendants be sued in their official capacities for monetary damages under § 1983. *See Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985); *Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003) ("§ 1983 plaintiffs should 'set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply their capacity as state officials'")

(citations omitted). The Court therefore **DISMISSES** the claims for monetary damages under § 1983 against OSUMC, Defendant Gee, and Defendant Gabbe; and **DISMISSES** the official-capacity claims for monetary damages under § 1983 against Defendant Harter, Defendant Pariser, and John and Jane Does.

Remaining are the individual-capacity claims against Defendant Harter, Defendant Pariser, and John and Jane Does; as well as Barnum's equitable claims, if any, asserted against OSUMC and the individual defendants in their official capacities. The Supreme Court has explained that "two inquiries . . . guide interpretation of the constitutional protections accorded to public employee speech." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). First, the Court must "[d]etermin[e] whether the employee spoke as a citizen on a matter of public concern." *Id.* (citing *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968)). If not, the employee has no cause of action for First Amendment retaliation. *Id.* (citing *Connick v. Myers,* 461 U.S. 138, 147 (1983)). If, however, the employee did speak as a citizen on a matter of public concern, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. . . . [T]he restrictions [the government entity] imposes must be directed at speech that has some potential to affect the entity's operations." *Id.* (citing *Pickering,* 391 U.S. at 568) (internal citation omitted). "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 419 (citing *Connick,* 461 U.S. at 147).

The Court first must determine whether Barnum spoke as a citizen on a matter of public concern. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole

8

record." *Connick*, 461 U.S. at 147–48. The First Amendment "does not empower [public employees] to 'constitutionalize the employee grievance.'" *Garcetti*, 547 U.S. at 420 (quoting *Connick*, 461 U.S. at 154). However, that the speech "concerned the subject matter of [a plaintiff's] employment . . . is nondispositive" because "[t]he First Amendment protects some expressions related to the speaker's job." *Id.* at 421 (citations omitted).

"In general, speech involves matters of public concern when it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government," "to be contrasted with internal personnel disputes or complaints about an employer's performance." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001) (internal citations and quotation marks omitted). "[S]peech falling into this category includes informing the public that a governmental entity failed to 'discharg[e] its governmental responsibilities' or 'bring[ing] to light actual or potential wrongdoing or breach of public trust [on the part of a governmental entity or any officials therein].'" *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (quoting *Connick*, 461 U.S. at 148). "Generally, '[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.'" *Brandenburg*, 253 F.3d at 898 (quoting *Marohnic v. Walker*, 800 F.2d 613 (6th Cir. 1986)).

"Mixed questions of private and public concern, where the employee is speaking both as a citizen as well as an employee, can be protected" if "any part of an employee's speech . . . relates to a matter of public concern." *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 716 (6th Cir. 2001). In such cases, because the employee "speaks from multiple motives, determining whether [she] speaks as a citizen or employee requires a precise and factually-sensitive determination." *Id.* (citation and internal quotation marks omitted). "In making this

factual determination, we generally look to what was said, rather than why it was said." *Id.* "The motive which underlies an employee's statements is a relevant, but not necessarily dispositive factor when considering whether an employee's statements may be fairly characterized as relating to any matter of . . . concern to the community." *Id.* at 716–17 (citation omitted); *see also Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 894 (6th Cir. 2003) ("subjective intent . . ., while relevant, is not a controlling factor") (citing *Perry v. McGinnis*, 209 F.3d 597, 609 (6th Cir. 2000)).

While OSUMC focuses on Barnum's statements regarding her divorce, such speech is not identified as the relevant speech for the purpose of her retaliation claim. Rather, Barnum's relevant speech is the complaint she filed on April 18, 2012 with OCR against OSUMC alleging a breach of Federal Standards for Privacy of Individually Identifiable Health Information. (2d Am. Compl. ¶¶ 27, 33.) Barnum asserts that her speech "was about the privacy of medical information in the hands of [OSUMC], which is a matter of public concern." (Dkt. 16 at 9.) OSUMC characterizes this speech as "complaints about OSUMC's privacy policies as they related to her employment with OSUMC," and "relat[ing] to her own private concerns, and not any matter of public concern." (Dkt. 15 at 5.)

The Court finds that Barnum's speech involved "[m]ixed questions of private and public concern." *Vaughn*, 269 F.3d at 716. While the privacy of Barnum's own health information is of private concern to her, OSUMC's practices relating to individually identifiable health information, particularly practices that are alleged to violate HIPAA, are a matter of public concern. As the Sixth Circuit held in *Brandenburg*, "'[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.'" *Brandenburg*, 253 F.3d at 898 (quoting *Marohnic*, 800 F.2d 613). Because Barnum's speech

alleged that OSUMC was not being operated in accordance with HIPAA, this case is distinguishable from those cited by OSUMC.

Because the Court finds that Barnum spoke as a citizen on a matter of public concern, the relevant question becomes whether OSUMC "had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. Because OSUMC's motion does not address this question, the Court need not reach it for the purpose of deciding the motion. Because OSUMC makes no further arguments regarding the remaining First Amendment retaliation claims, the motion is **DENIED** as to those claims.

### Count 2. Equal Protection Conspiracy

Barnum asserts a claim for conspiracy to deprive her of equal protection under 42 U.S.C. §§ 1983 and 1985. Specifically, she alleges that "Defendants conspired . . . and retaliated with invidious discrimination against Ms. Barnum to deprive her of equal protection . . . because Ms. Barnum engaged in speech that supported . . . compliance with federal privacy laws which were disregarded" by OSUMC. (2d Am. Compl. ¶ 35.)

Because Barnum does not allege class-based discrimination, her equal protection claim must be dismissed. "[A]n equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'" *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)). However, this "class-of-one theory of equal protection has no application in the public employment context." *Id.* at 607. Therefore, the motion is **GRANTED** as to Barnum's equal protection claim, which is hereby **DISMISSED**.

### Count 3. Neglect to Prevent Violations of Equal Protection

Barnum asserts a claim against Defendants Harter and Pariser for neglect to prevent

11

violations of equal protection under 42 U.S.C. § 1986. Barnum alleges that "Drs. Harter and Pariser were in positions of authority at [OSUMC] with the power to prevent, or aid in preventing, the commission of the violations of equal protection described in this Complaint, yet neglected and refused to do so." (2d Am. Compl. ¶ 36.)

Because the Court has already determined that Barnum's equal protection claim fails as a matter of law, her claim under § 1986 also fails. "Where a plaintiff has stated no cause of action under § 1985, no cause of action exists under § 1986." *Braley v. City of Pontiac*, 906 F.2d 220, 227 (6th Cir. 1990) (citations omitted). Defendant's motion is **GRANTED** as to Barnum's claim for neglect to prevent violations of equal protection, which is hereby **DISMISSED**.

**Count 4. <u>Due Process</u>**

Barnum asserts a claim for deprivation of liberty and property interests without due process of law under 42 U.S.C. § 1983. Specifically, she alleges:

> Ms. Barnum has been deprived of her ability to work because she was placed on an unspecified leave. She was publicly defamed in conjunction with unconstitutional, retaliatory conduct by Defendants and its employees in positions of authority. OSU Medical Center failed to notify Ms. Barnum of the reason for its decision to place her on unpaid leave, and failed to provide her with a sufficient opportunity to be heard. Ms. Barnum was thus deprived of liberty and property interests without due process of law, all of which gives rise to a claim for injunctive relief for reinstatement against Defendants under 42 U.S.C. 1983, injunctive prospective relief barring any future acts of discrimination or retaliation, and money damages against Defendants Harter, Pariser, and John and Jane Does No. 1-10 under 42 U.S.C. 1983.

(2d Am. Compl. ¶ 38.) It appears that Barnum seeks only injunctive relief, not monetary damages, against OSUMC. To the extent that Barnum seeks monetary damages under § 1983 against the individual defendants in their official capacities, such claims are dismissed, for the reasons discussed above. *Will*, 491 U.S. at 70; *Russell*, 537 F.3d at 610; *Graham*, 473 U.S. at 166–67; *Rodgers*, 344 F.3d at 594.

Remaining are Barnum's claims for monetary damages against Defendants Harter, Pariser, and John and Jane Does in their individual capacities. As for these claims, she alleges that, without due process, she was deprived of her (A) property interest in her employment and (B) liberty interest in her reputation.

### A. Property Interest in Employment

In considering a claim that a plaintiff was deprived of property without due process, the Court must first determine whether the plaintiff has a property interest that entitles her to due process protection. *Leary v. Daeschner*, 228 F.3d 729, 741 (6th Cir. 2000) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)). "'Property interests . . . are not created by the Constitution,' but 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Id.* (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). For example, a civil service statute or a collective bargaining agreement may create a property interest. *Corbett v. Garland*, 228 F. App'x 525, 526 (6th Cir. 2007); *Leary*, 228 F.3d at 741–42 (citing *Roth*, 408 U.S. at 577–78; *Johnston–Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir.1990)). If the Court concludes that a plaintiff has such an interest, it "must then determine 'what process is due.'" *Leary*, 228 F.3d at 742 (quoting *Loudermill*, 470 U.S. at 541).

Barnum's complaint specifically alleges neither that she is a classified civil servant nor that her employment is protected by contract. She argues that her complaint states a plausible claim because her position, "a nurse for a state university hospital," "is not listed under O.R.C. Section 124.11(A) as being Unclassified," and is therefore a classified position. (Dkt. 16 at 14.)

Ohio's civil-service statute, Ohio Revised Code § 124.11, "creates a property right in

13

continued employment for classified civil servants; a classified civil servant cannot be deprived of this right without due process." *Corbett*, 228 F. App'x at 526 (citations omitted). Section 124.11 "divides the civil service into classified and unclassified positions by explicitly naming the unclassified positions and providing that the classified service shall comprise those civil-service positions 'not specifically included in the unclassified service.'" *Id.* at 527 (quoting Ohio Rev. Code § 124.11(A), (B)). "With regard to public universities, the statute provides that the following employees are unclassified: '. . . such employees as are engaged in educational or research duties connected with the public . . . universities, as determined by the governing body of the public . . . universities.'" *Id.* (quoting Ohio Rev. Code § 124.11(A)(7)(a)).

As noted above, Barnum asserts that her position is not listed as unclassified under § 124.11(A) . (Dkt. 16 at 14.) However, without knowing whether she is "engaged in educational or research duties . . . as determined by [OSU's] governing body," for which discovery may be necessary, it is unclear whether her position is classified. OSUMC does not address the issue in its reply brief, merely arguing in its motion that Barnum's complaint fails to allege specifically that her position is classified. While Barnum's complaint could have alleged that her position is classified, it contains sufficient allegations to state a plausible claim, and discovery may be necessary to determine whether her position is classified. If discovery determines that her position is unclassified, this claim would be subject to dismissal on summary judgment. At this stage, however, the Court will not dismiss Barnum's claim for insufficient evidence that her position is classified.

The Court also finds no merit in OSUMC's conclusory statement that Barnum needs "a more specific identification of what procedures were not followed" to deprive her of due process. (Dkt. 15 at 10.) After setting forth detailed allegations regarding her interactions with OSUMC,

14

Barnum alleges in her complaint that OSUMC "failed to notify [her] of the reason for its decision to place her on unpaid leave, and failed to provide her with a sufficient opportunity to be heard." (2d Am. Compl. ¶ 38.)

The Court therefore **DENIES** OSUMC's motion as to Barnum's claim that she was deprived of her property interest in her employment without due process.

### B. Liberty Interest in Reputation

Barnum also asserts that she was deprived of her liberty interest in her reputation without due process. "[I]njury to reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (citing *Paul v. Davis*, 424 U.S. 693, 708–09 (1976). Defamation may violate due process, however, "in the context of [a state] employer discharging or failing to rehire a plaintiff." *See id.*; *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972) ("(w)here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential"); *Owen v. City of Independence, Mo.*, 445 U.S. 622, 661 (1980) ("[d]ue process requires a hearing on the discharge of a government employee 'if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination'").

Even assuming that OSUMC's placement of Barnum on extended leave is sufficient context for accompanying defamation to violate due process, Barnum fails to allege facts sufficient to assert a successful due process claim for defamation. Such a claim depends on the plaintiff's request for, and the employer's denial of, a name-clearing hearing. "It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." *Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002). Barnum argues that she was unaware of her

right to a hearing. (Dkt. 16 at 16.) However, the Sixth Circuit has held that "a plaintiff who fails to allege that he has requested a hearing and was denied the same has no cause of action, whether or not [she] had been informed of a right to a hearing before filing suit." *Quinn*, 293 F.3d at 324. Because Barnum does not allege that she requested such a hearing, her claim fails, and the Court need not address the question of whether she would have been entitled to such a hearing.

The Court therefore **GRANTS** OSUMC's motion as to Barnum's claim for deprivation of her liberty interest in her reputation without due process, and **DISMISSES** such claim.

### Count 5. Rehabilitation Act

Barnum asserts a claim for discrimination based solely on disability, perceived disability, and/or classification or misclassification as disabled, in violation of the Rehabilitation Act, 29 U.S.C. §§ 701 et seq., and specifically 29 U.S.C. § 794. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her . . . disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a cause of action under this section, a plaintiff must satisfy the following elements: (1) she must be a "handicapped person" as defined by the Rehabilitation Act; (2) she must be "otherwise qualified"; (3) she must be excluded from participation in, denied the benefits of, or subjected to discrimination solely by reason of her handicap; and (4) the program or activity must receive Federal financial assistance. *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988) (citations omitted).

OSUMC argues that Barnum's claim fails because she "alleges multiple reasons for her alleged damages and claims for relief in this matter, and consequently fails to allege that disability was the sole reason for any alleged adverse employment actions." (Dkt. 15 at 12.) As Barnum points out, Rule 8(d) permits alternative and inconsistent claims, and Count 5 of

16

Barnum's complaint alleges that Barnum's actual or perceived disability was the sole reason for the alleged discrimination. (Dkt. 16 at 2–3; 2d Am. Compl. ¶¶ 39–46.) While Barnum alleges other reasons for the alleged adverse employment action, those reasons are contained within separate alternative claims. OSUMC cites no controlling case law, and this Court has found none, holding that a plaintiff cannot allege a claim under the Rehabilitation Act as an alternate and inconsistent theory of recovery. *See Blumenthal v. Murray*, 995 F. Supp. 831, 836 (N.D. Ill. 1998) (dismissing a Rehabilitation Act claim in which the plaintiff alleged that the discrimination was based on both race and perceived disability, but noting that the plaintiff "may be able to plead race and handicap discrimination [under the Rehabilitation Act] in alternative counts"); *but see Yates-Mattingly v. Univ. of Cincinnati*, 1:11-cv-753, 2012 WL 3779934 (S.D. Ohio Aug. 31, 2012) (in an unpublished decision of this Court, dismissing a Rehabilitation Act claim where the plaintiff alleged in separate counts that she was terminated because of her age and race, in addition to her disability).

Because Barnum alleges her Rehabilitation Act claim as an alternate theory of recovery, and because Rule 8(d) permits alternative and inconsistent claims, the Court **DENIES** OSUMC's motion as to Barnum's claim under the Rehabilitation Act.

**Count 6.   Americans with Disabilities Act**

Seeking only injunctive relief, Barnum asserts a claim for discrimination based on disability or perceived disability in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 1201 *et seq.*, including 42 U.S.C. § 12132. Although OSUMC reinstated Barnum's employment in November 2012, she alleges that Defendants altered her case assignment, locations, and schedules; and eliminated her sick days. (2d Am. Compl. ¶ 49.)

The parties' briefing on this claim focuses on the rule that "states are immune to suits for money damages under Title I of the ADA." *Robinson v. Univ. of Akron Sch. of Law*, 307 F.3d

409, 411 (6th Cir. 2002) (citing *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001)).  Because Barnum seeks only injunctive relief on her ADA claim, however, her claim is not precluded by sovereign immunity.  *Garrett*, 531 U.S. at 374 n.9.

OSUMC also argues that a claim for injunctive relief fails because Barnum's employment has been reinstated.  According to OSUMC, Barnum's reassignment, without a change in salary or benefits, does not constitute an adverse employment action.  (Dkt. 15 at 14.)  Barnum counters that her altered case assignment, locations, and schedules; as well as the elimination of her sick days, constitute a continuing violation of the ADA.  (2d Am. Compl. ¶ 49; Dkt. 16 at 8.)

The Sixth Circuit has explained that "[a]n adverse employment action is a materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct."  *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (citation and quotation marks omitted).  It "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (citation and quotation marks omitted).  "[D]e minimis employment actions," as well as actions causing "a 'bruised ego,'" are "not enough to constitute an adverse employment action."  *Id.* (citation and quotation marks omitted).

"Reassignments and position transfers can qualify as adverse employment actions, particularly where they are accompanied by salary or work hour changes."  *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (citation and quotation marks omitted).  "An 'inconvenience resulting from a less favorable schedule can render an employment action 'adverse' even if the employee's responsibilities and wages are left unchanged.'"  *Id.* at 392 (quoting *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008)) (a Title VII case); *see also Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (adopting a

definition of "materially adverse employment action" from "cases involving the ADEA and Title VII," which the Court noted "are instructive in cases involving the ADA"). On the other hand, "[r]eassignments *without* changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) (citation omitted) (emphasis added). A reassignment is an adverse employment action when it "rises to the level of a constructive discharge"; that is, "its conditions must be objectively intolerable to a reasonable person. An employee's subjective impressions as to the desirability of one position over another are not relevant." *Id.* (internal citations omitted).

Barnum has alleged significant changes in her terms of employment, including changes in her case assignment, locations, and schedules. While she historically worked at a consistent location, she now must check in to determine the location of her shift every preceding evening. Her new schedule also conflicts with her second job. As noted above, "a less favorable schedule can render an employment action 'adverse' even if the employee's responsibilities and wages are left unchanged.'" *Spees*, 617 F.3d at 392. This Court finds that Barnum has alleged facts sufficient to plausibly constitute an adverse employment action. Because OSUMC makes no further arguments regarding this claim, its motion is **DENIED** as to Barnum's claim under the Americans with Disabilities Act.

## IV. Conclusion

For the reasons discussed above, the Court hereby **GRANTS IN PART** and **DENIES IN PART** OSUMC's Motion. (Dkt. 15.) As for Barnum's claims under § 1983, the Court hereby **DISMISSES** claims Barnum's for monetary damages against OSUMC, Defendant Gee, and Defendant Gabbe; as well as claims for monetary damages against Defendant Harter, Defendant Pariser, and John and Jane Does in their official capacities. Remaining are Barnum's claims for

monetary damages under § 1983 against Defendant Harter, Defendant Pariser, and John and Jane Does in their individual capacities; as well as equitable claims, if any, under § 1983. The Court hereby **DISMISSES** Barnum's claims for equal protection violations and neglect to prevent violations of equal protection. As for Barnum's due process claims, the Court hereby **DISMISSES** Barnum's claim for deprivation of her liberty interest in her reputation without due process, but **DENIES** OSUMC's motion as to Barnum's claim that she was deprived of her property interest in her employment without due process. The Court also **DENIES** OSUMC's motion as to Barnum's claims under the Rehabilitation Act and the Americans with Disabilities Act.

    **IT IS SO ORDERED.**

UNITED STATES DISTRICT JUDGE